MANSFIELD, Justice
(dissenting).
I respectfully dissent and would affirm termination of the father’s parental rights. The court offers various tests for what “removed from the physical custody of the child’s parent[]” means as used in Iowa Code section 232.116(l)(e )(2) and section 232.116(l)(/')(3) (2015). Boiled down, those tests require that there be a “dynamic change of circumstance, not stasis.” I think the court’s “dynamic change” test was easily satisfied under the facts of this case.
Here the father was living with both the mother and C.F.-H. until the fall of 2012. At that time, following the latest report of domestic violence and a report of possible drug use by the father, the Iowa Department of Human Services (DHS) initiated a safety plan that effectively removed the father from the family home. This alteration of status was confirmed in two court orders which gave “custody” of five-year-old C.F.-H. to the mother and provided that the father could only have “visitation ... at the discretion of’ DHS. Thereafter the father repeatedly refused services. C.F.-H. never resided with his father again until the father’s parental rights were terminated in 2016. This case therefore meets *209 the majority’s standard for termination of parental rights. C.F.-H. had been taken away from the father’s physical custody through a combination of actions by DHS and the juvenile court.
Additionally, the majority’s test is incorrect. “Removed” is susceptible to two different interpretations. One requires physical separation of the child from the parent. (For example, “I am removed from these events.”) The other requires physical separation plus some affirmative action that brought about the separation. While the latter is the more common use of “removed,” I believe the former test is the one the legislature intended and wrote into the statute in 1992.
Finally, I disagree with the majority’s contention that the State waived any argument on appeal that the child had been “removed” from the father’s custody. I do not believe such a waiver is even possible in a termination of parental rights case, and it certainly did not occur here.
I. The Child Was “Removed” from the Father’s Custody Even Under the Majority’s Standard.
I begin with a review of the factual record. The juvenile court made a finding that C.F.-H. had been removed from the father’s custody. An examination of the record not only demonstrates the correctness of this finding, but also shows why this judge, who had presided over this case over its four-year progression from the beginning, correctly terminated the father’s parental rights.
In November 2012, when C.F.-H. was five years old, he was adjudicated a child in need of assistance (CINA) after the father and mother physically assaulted each other in the family home and there were concerns the father was using methamphetamine.[4] This followed an earlier incident where the father had assaulted the mother. At the time of the second assault, the child was living with both parents, but they were behind on their bills and in danger of losing their housing.
The mother agreed to a DHS safety plan whereby the father would no longer be allowed in the home. The ensuing CINA order provided “[t]hat custody of [C.F.-H.] shall remain with his mother ... subject to protective supervision being provided by the Iowa Department of Human Services” and “[t]hat visitation for [C.F.-H.] with his father ... shall be at the discretion of the Iowa Department of Human Services.” The order also directed both parents to receive certain services. The father moved out of the home.
Three weeks later, a dispositional order was entered. The order reiterated that custody of C.F.-H. would remain with his mother subject to protective supervision from DHS and that the father would have visitation at the discretion of DHS. Again, the parents were directed to receive certain services.
The father did not cooperate in services for the most part. In 2013, he tested positive for methamphetamine and acknowledged ongoing methamphetamine use. After that, he refused drug testing. He never completed the required batterer’s education program or went through the psychological evaluation ordered by the court.
In 2014, anticipating the completion of CINA proceedings, a district court entered a temporary custody order giving the mother primary physical care of C.F.-H. subject to supervised visitation by the father. Over the mother’s objection, the parties were granted joint legal custody. The parties agreed to enter a permanent order *210 along the same lines in early 2015. But the CINA proceedings never ended.
As the years passed, the mother had to obtain several no-contact orders against the father. These orders were based on ongoing threats relayed by phone, text, and email from the father to the mother. A number of those threats are in the record. In addition to outright threats, the father sent numerous messages that were highly profane, demeaning, and abusive to the mother and to the female DHS social worker assigned to the case.
After the fall of 2012, C.F.-H. never again resided with his father. While the boy was in his mother’s care, he gradually improved. He had a series of emotional and behavioral issues and received special education services at school, but he made progress.
During the four years from 2012 to 2016, the mother generally put her life in order. The father did not. The father’s last unsupervised contact with C.F.-H. came approximately a year before the termination hearing. His last participation in a family meeting took place approximately eleven months before, at which the father “ended the meeting by calling [the mother] horrible names.” The father also stopped showing up for counseling with C.F.-H., having walked out of the last meeting. The most recent visit or contact of any kind between the father and C.F.-H. occurred ten months before the termination hearing. In November 2015, C.F.-H.’s therapist wrote,
Given [the father’s] threats to [the mother] and her other son ...; his verbal and written disrespect to [the mother] and [the DHS social worker]; his refusal to follow DHS requirements for UAs and substance abuse treatment aftercare; and his continued alcohol and likely other mind-altering substance use; plus his history of domestic violence, I see little hope in this man making the needed changes to provide [C.F.-H.] with a safe, stable, nurturing environment during visitation.
The DHS social worker believed that the father was using drugs, noting his weight loss. So did the mother, noticing the father’s agitated state and the metallic smell to his sweat. In December 2015, the father was arrested on a warrant and also charged with driving while under suspension. He did not have regular housing, having been kicked out of the accountability house where he was living due to concerns he had relapsed. The father testified on this subject at the termination hearing:
Q. ... Where do you live currently? A. I’m in between—I’ve been in between places.
Q. Okay. How long have you been in between places? A. Quite a while.
Q. Well, give me a time frame. What’s quite a while? A. Quite a while.
Q. Is that one month? Three months? Six months? A. I gave you will the time frame. It’s quite a while.
Q. Okay. And before your quite a while started, where did you live? A. With my son.
[[Image here]]
Q. Okay. So if you had a visit with [C.F.-H.], where would that visit take place? A. Probably at my friend’s house or at the mall, at a park, anywhere he wanted to go, the train museum.
Q. But you wouldn’t have any place for him to sleep, would you? A. Sure.
Q. At the friend’s house? A. There or at a hotel room.
Q. What’s the friend’s name? A. None of your business.
The termination hearing began on March 22, 2016. Fifteen minutes into the hearing, the father walked out of the courtroom, although he later returned to *211 the courtroom to testify when the hearing resumed on April 1. During the intervening week between March 22 and April 1, the father texted a social worker as follows: “Tell that fat lying b_[referring to the mother] [C.F.-H.] better answer his phone when I call she can have her UA [too] if I can use her mouth as a specimen cup.” This text was made part of the record during the second day of the hearing.[5]
The State’s last witness on the second day was a deputy sheriff who had been working in the courthouse. He testified that he detected an odor of alcohol coming from the father that day. He also had noticed a wet spot in the crotch of the father’s pants that “sometimes can indicate somebody that is under a controlled substance or alcohol.”
Throughout the hearing, the father remained openly defiant about not submitting to drug or alcohol testing. On this subject, the father testified,
Q. Okay. You’ve been court-ordered to provide drug testing with the Court for a number—I think from the beginning of—A. Yes. And as I stated, give me a valid reason.
Q. That what? A. I said give me a valid reason.
Q. Well, I didn’t—I don’t have to give you a valid reason. The Court ordered you to participate in drug testing. So the Court made a determination that you were to provide random drug and/or alcohol testing as requested by the Department of Human Services or a substance abuse treatment provider. A. And I said give me a valid reason.
Q. So you’re just choosing to ignore the Court’s order? A. I’m choosing to say they need a valid reason to ask for one.
The other witnesses uniformly offered the opinion that termination of the father’s parental rights would be in C.F.-H.’s best interests, even if it left him with only one parent. The DHS social worker testified,
Q. And isn’t it also true that since [C.F.-H.] has not had any contact with his father over the course of the last nine months, that his functioning has significantly improved in all aspects of his life, in academics and behaviorally in school, as well as at home? A. Correct.
The DHS social worker added, “I feel that after four and a half years together and the significant safety concerns that we have today, that that’s really my only option, to recommend termination of parental rights.” She also volunteered, “[T]here’s a small portion of me that’s kind of—almost feels guilty that we’ve waited this long because [C.F.-H.] is the one emotionally that suffers through all of this.”
Meanwhile, the mother testified,
Q. Are you in support of [the father’s] rights as to [C.F.-H.] being terminated? A. Yeah.
Q. You’re going to lose out on child support. A. I don’t care.
Q. Okay. You’re also not going to have—[C.F.-H.], like I said, he doesn’t have another person to step in to be a dad to him. A. He hasn’t for a long time.
Q. He’s never had a dad? Is that your testimony? A. Not really. (Witness crying.)
Q. Okay. And what else can you tell us about [C.F.-H.]? Why is this important for [C.F.-H.] to have [the father] out of his life legally? A. I know [C.F.-H.] loves his dad and I know his dad loves him, *212 but it’s not fair to a child to have his dad come in and out of his life just when it’s convenient for him. I was lucky my dad chose his children over the demons of— of the demons from drugs and alcohol. I don’t understand why it’s this hard for [the father] to keep going back there.
I could go on but this is not a close case. The juvenile court’s termination of the father’s parental rights was clearly justified under Iowa Code section 232.116(l)(e) and (f).
The State proved C.F.-H. had been “removed” from the father’s custody, even under the majority’s interpretation of that requirement. In addition to the specific chronology recited above, we have the summary testimony of the DHS social worker:
Q. [A]t the time that the Department of Human Services became involved with this family in juvenile court, isn’t it true that [the father and the mother] were living together with [C.F.-H.]? A. Correct.
Q. And subsequent to then juvenile court becoming involved, isn’t it true that your recommendation to the Court was that custody of [C.F.-H.] be placed with [the mother] and not with [the father]? A. Correct.
Q. And [the father] subsequently then moved out of the family home; isn’t that correct? A. Correct.
Q. Okay. And so in regards to the grounds of the termination petition, isn’t it true that [C.F.-H.] has been removed from the physical custody of his father for the last 12 of the last 18 months? A. Correct.
Q. In fact, [the father] has never had physical custody of [C.F.-H.] since the Department of Human Services became involved in these proceedings; isn’t that correct? A. Correct.
In short, once we examine the record, it becomes clear that the father is raising an academic point about the meaning of “removed” with no connection to the actual facts of this case. I do not fault the father’s counsel for advancing this argument. Counsel has performed admirably despite having very little to work with. But I would affirm this termination and wait for another case where the meaning of “removed” matters.[6]
II. In Any Event, the Majority’s Interpretation of “Removed” Is Incorrect.
Furthermore, I question whether the majority’s standard is the right one. The full texts of Iowa Code section 232.116(l)(e )(2) and section 232.116(l)(f)(3) require that the child have been “removed from the physical custody of the child’s parents for” a minimum period of time. See Iowa Code § 232.116(l)(e )- (/■). It is sufficient that the child and the parent have been physically separated from each other, regardless of how that happened. The statute simply says “removed.” It does not require that any entity such as DHS or the court have performed “a removal.”
Also, the statute says “removed ... for” a minimum period of time (which varies *213 depending on whether subsection (e) or (/') is at issue). Even under a' dynamic interpretation, there would be only one discrete act of removal. Therefore, references to “removed” followed by a time duration arguably support a static interpretation and suggest that the separation is what matters, not how it initially came about.
In 1992, the legislature amended Iowa Code section 232.116(1). See 1992 Iowa Acts ch. 1231, §§ 27-29 (codified at Iowa Code § 232.116(1) (1993)). Previously, to prove grounds for termination under what are now sections 232.116(l)(e) and (f), the State had to show that “[t]he custody of the child has been transferred from the child’s parents for placement pursuant to section 232.102.... ” Iowa Code § 232.116(l)(d )-(e) (1991). That requirement was left in place for some of the other sections, but the 1992 legislation struck it from subsections (e) and if). Compare Iowa Code § 232.116(l)(i )-(⅛) (1993), with id. § 232.116(l)(d )-(e), (g). Thus, for termination of parental rights under subsections (e) and (f), something less than a dispositional order transferring legal custody of the child is required. This tells me there should be a practical approach to the word “removed.” And under a practical approach, if (1) a child has been adjudicated in need of assistance, (2) the child has been out of the parent’s care for the required period of time, (3) the parent—despite the provision of services—Is incapable of caring for the child, and (4) termination is in the child’s best interests, does it really matter how the whole proceeding started?
This case is a good illustration of that point. C.F.-H. had been in CINA limbo for three-and-a-half years. Time was clearly running out. See Iowa Code § 232.101(2) (2016) (stating that when the court after the dispositional hearing permits a parent to retain custody of the child under supervision, this order may not last longer than a year and may only be extended twice for up to one year each time). The father was clearly an unfit parent and an obstacle to the child’s well-being and successful emergence from CINA proceedings. The father’s status needed to be addressed before DHS could disengage itself from this case.
Another important reason for reading “removed” broadly is that we decided long ago to read “parents” broadly as including only one parent. The statute literally requires that “[t]he child has been removed from the physical custody of the child’s parents.” Id. § 232.116(l)(e )-(f) (emphasis added). If “parents” meant only both parents, then obviously the only way for neither parent to have custody would have been some kind of movement in the past by which the child and the parents were separated.
However, in 1992,-after the legislature had amended the statute as noted above earlier in the year, we held that when a child is in the custody of one parent, the statutory provisions referring to “parents” could nonetheless be used to terminate the parental rights of the noncustodial parent only. In re N.M., 491 N.W.2d 153, 156 (Iowa 1992). This rule is now firmly entrenched in our caselaw. See, e.g., In re H.S., 805 N.W.2d 737, 749 (Iowa 2011). Once it is clear that just a single noncustodial parent’s rights may be terminated, it makes no sense to draw lines over how that parent became a noncustodial parent, so long as the other requirements for termination have been met. In other words, the broad definition of “removed” works in tandem with our broad definition of “parent.”[7]
*214 The court expresses concern about an absent parent who may be in military service or just “out of the country.” There are laws addressing the former situation. See, e.g., 50 U.S.C. § 3932 (2012) (stay of proceedings); Iowa Code § 29A.93 (stay of proceedings); id. § 232.116 (stating that the court need not terminate if the absence of a parent is “due to active service in the state or federal armed forces”). Otherwise, when a child has been adjudicated CINA and is being supervised by DHS, the parent should understand that the clock is running. Being “out of the country”—if the parent is not serving in the military—is not an adequate excuse for failing to address the serious parenting problems that led to the CINA adjudication in the first place.
Further, the court indicates that every parent should get “a chance at physical custody” before losing parental rights. In my view, it depends on what one means by “a chance at physical custody.” The very purpose of the CINA proceeding is to give the parents every chance to succeed. Here the father was given many such chances. He wasted them. Once a child has been adjudicated CINA, our juvenile laws do not guarantee—nor should they guarantee—that every parent will get a trial run at parenting on his or her own unilateral terms. Yet that is what this father wants and claims to be entitled to under the law.
I fear the majority’s approach to this case will lead to a bleak and pointless outcome. The father will never be able to establish an appropriate relationship with C.F.-H., because he continues to refuse to address his drug and alcohol issues. DHS will need to stay involved indefinitely. No permanency will be achieved. And the mother, DHS, and service providers will continue to be subjected to unacceptable verbal abuse that no judge or other employee of the Iowa Judicial Branch would tolerate in his or her line of work.
III. The State Did Not Waive the Issue of Whether C.F.-H. Had Been Removed from His Father’s Custody.
As noted, the juvenile court made a finding below that C.F.-H. had been removed from his father’s custody. The majority brushes past that finding, however. It faults the State for not defending that finding on appeal. In my view, the eourt misunderstands our role in termination-of-parental-rights appeals and also fails to put the State’s appellate response in the proper context.
I agree that the State’s response to the father’s petition on appeal was inartful. Still, the State correctly pointed out that when the CINA petition was filed in the fall of 2012, the father had been living with the mother and C.F.-H. Thereafter, as part of a safety plan, the father was no longer allowed in the home. The State also acknowledged, “Throughout this case, [C.F.-H.] has never been in the father’s physical custody.” That statement was correct. Since this case was commenced by the filing of the CINA petition, C.F.-H. has not lived with his father.
True, the State later made an incorrect statement that C.F.-H. “has never been in the father’s physical custody.” (Emphasis added.) I suspect that the State either was *215 trying to say that C.F.-H. had never lived with the father alone, or was pointing out there had not been an initial custody proceeding for C.F.-H., or simply made an error. Regardless, this does not mean we should close our eyes to the record in this case.
To begin with, the State did not have to file a response to the father’s petition on appeal at all. The special rules governing expedited CIÑA and termination-of-parental-rights appeals provide that any response to a petition on appeal is “optional.” Iowa R. App. P. 6.202(1).
Also, unlike in a normal appeal, the parties usually do not have access to the transcript during the briefing process. For example, in this case, the transcript was filed in the district court on a Friday afternoon and the State submitted its response to the father’s petition on appeal to our court the following Monday. I would presume the State had no opportunity to review the transcript before preparing its response.
Accordingly, we may affirm the juvenile court’s order based on our independent review of the record, regardless of the content of the appellee’s response. See, e.g., In re D.W., 791 N.W.2d 703, 707 (Iowa 2010) (“[W]e may affirm the juvenile court’s termination order on any ground that we find supported by clear and convincing evidence.”). In a termination-of-parental-rights case like this, where the State’s appellate counsel may have fumbled the discussion of the record somewhat in its optional response, our job is to review the record independently and apply the law to it.
Also, in fairness to the State, the father was making a different argument in his petition on appeal than the court endorses today. The father argued on appeal that a formal removal order was necessary. The State’s response was geared to that argument. Now, however, the majority determines that a de facto removal is sufficient, but it won’t examine the record for evidence of a de facto removal. Instead, it relies on a purported concession by the State in the context of a different argument. I think that is unfair.
For all these reasons, I respectfully dissent and would affirm both the juvenile court and the court of appeals.
Waterman and Zager, JJ., join this dissent.

. The father had prior convictions for methamphetamine possession.

. I realize this message is very offensive but I quote it because it is representative of many other texts sent by the father and because it helps one understand the manner in which the father's harassment was undermining efforts to stabilize the child's life.

. The father also argues that the best interests of the child did not support termination and that the juvenile court erred in admitting therapist records. I agree with the juvenile court and the court of appeals that termination is in the best interests of the child. I also find clear and convincing evidence to support termination even without consideration of the therapist records, and even without considering whether they are covered by Iowa Code section 232.96(6). See Iowa Code § 232.96(6) (providing that certain reports and records are admissible in juvenile proceedings).

. Unfortunately, the majority opinion creates additional doubt when it leaves open the pos *214 sibility in a footnote that even a "dynamic" removal from a custodial parent would be insufficient to meet the statutory removal requirement as to the noncustodial parent. Under this scenario, despite a CINA adjudication and a child’s relocation from the custodial parent to foster care, the clock would not start running as to the noncustodial parent. I do not think the majority intends this result, but the reasoning in its opinion does not preclude it.